1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.  1:19-CR-00256 -JLT-SKO |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS; ORDER DENYING AS MOOT DEFENDANT'S MOTION TO SEVER[1] |
| v. | |
| DAVID MICHAEL MARIN, | (Docs. 425, 427) |
| Defendant. | |

        David Marin moves to suppress evidence obtained against him pursuant to two wiretaps

and a search warrant. (Doc. 425) Marin argues that the original wiretap constituted an unlawful

search and seizure, such that any evidence obtained from that wiretap and the subsequent wiretap

and search warrant should be suppressed. Because the Court finds the original wiretap was issued

according to law, the motion is **DENIED**.

**I.      BACKGROUND**

        In 2018, the Fresno Police Department was engaged in an investigation of drug trafficking

activities, which included alleged criminal activities by William Lee Muhammad. (Doc. 16 at 10)

During this investigation, District Judge Lawrence J. O'Neill issued a wiretap authorization on

---

[1] The Court does not offer any analysis as to the motion to sever (Doc. 427), because it has already granted the relief sought by Mr. Marin (Doc. 206). Thus, the motion to sever (Doc. 427) is **DENIED** as **MOOT**. This does not preclude the Court from reconsidering the order set forth in Doc. 206 if appropriate as the trial dates approach, whether sua sponte or upon motion of a party, based upon the fact that Mr. Marin now is the only remaining defendant charged in Counts One, Two, Four and Eight.

1

Muhammad's telephone (number 1:18-sw-00421-LJO). During the wiretap, investigators developed the belief that David Marin used Target Telephone 10 and on one occasion, communicated with Muhammad (who used Target Telephone 3) to supply him nine ounces of suspected cocaine base that Muhammad intended to supply to a third person, Wendell Moultrie (1:19-sw-87 LJO, Doc. 2 at 16, ¶ 39(b) ("Affidavit"))

The call at issue occurred on November 23, 2018, just minutes after Muhammad and Moultrie discussed the need to obtain a source who could provide higher quality cocaine. (Affidavit at ¶¶ 64-69) During the call placed by Muhammad to Marin[2], Muhammad referred to Marin as "Gov." *Id*. at ¶¶ 68-69. Muhammad told Gov that he needed nine ounces of cocaine base. *Id*. Marin agreed to travel to Muhammad's location to talk in person. *Id*. A few minutes later, Muhammad called Moultrie to tell him that Marin was willing to sell the nine ounces of cocaine based for $3,400[3]. *Id*. at ¶¶ 70-71. Moultrie explained that he wanted to bring someone to the Muhammad's house to smoke some of the cocaine to ensure its quality. *Id*. at ¶¶ 70-72. Muhammad agreed to call Moultrie when Marin arrived. *Id*.

In the meanwhile, Marin called Muhammad and asked whether Muhammad was ready to make the exchange. Affidavit at ¶ 72. Muhammad told Marin that he was waiting for Moultrie to arrive (though the affidavit indicates that he did not use Moultrie's name) and that he would call Marin once Moultrie arrived. *Id*. A few minutes later, Moultrie called Muhammad to tell him he was on his way to Muhammad's house and a few minutes after that, Muhammad called Marin to tell him he was ready. *Id* at ¶¶ 74-75. Marin confirmed he would drive over. *Id*.

A Special Agent stationed near Muhammad's residence saw Moultrie arrive and at the same time, Muhammad received a call from Moultrie telling Muhammad that Moultrie had arrived. Affidavit at ¶¶ 76-77. The Special Agent then saw Moultrie get out of his car and

---

[2] The Court recognizes that Mr. Marin argues that there was insufficient evidence that he was the user of TT10 when the agent applied for the wiretap at issue. However, to make the factual recitation easier to follow, the Court uses "Marin" rather than "TT-10)" to refer to the user of this phone.

[3] The Court agrees with the defendant that the affidavit does not reflect that "Gov" quoted this price (Doc. 425 at 14). However, this is what Muhammad *said* that his supply contact, Marin/Gov said. (Affidavit at ¶¶ 70-71) The Court recognizes also that the Affidavit and the one supporting the wiretap issue in case 1:19-sw-00180 LJO, supports the government's explanation that Marin has conflated the price of cocaine and the price of cocaine base.

approach the residence. *Id*. at 78. A few minutes later, the Special Agent saw Marin arrive in a vehicle driven by another person. *Id*. At ¶ 79. Marin and the other person entered the residence. *Id*. About 20 minutes later, the Special Agent saw Moultrie leave. *Id*. at ¶ 80. Police performed a traffic stop on Moultrie and, though they used a drug-sniffing dog and the dog alerted to the scent of narcotics, they found no narcotics but found a "glass smoking device." *Id*.

Moultrie called Muhammad soon after he was released from the traffic stop and the two discussed the traffic stop and the fact that Moultrie thought that there was police surveillance at Muhammad's residence. Affidavit at ¶¶ 81-82.  They also discussed the people they met with earlier at Muhammad's house, including "Gov[4]." *Id*.  Muhammad vouched for Gov/Marin and described him as "good." *Id* at ¶¶ 81-82. Based upon this information, the affiant concluded that, though Muhammad, Moultrie and Marin met to conduct a drug transaction, ultimately the transaction did not occur because no drugs were found in Moultrie's vehicle.[5] *Id*. at ¶ 84.

Since the November 2018 event, which was a basis of the agent's conclusion that Marin was a supplier of cocaine base, officers conducted "periodic surveillance" at Marin's home. Affidavit at ¶ 171. Officers observed that "during these surveillances," the vehicle used to transport Marin to Muhammad's residence on November 23, 2018, and a black Mercedes were "consistently observed parked at the residence." *Id*. During one of these surveillances on January 10, 2019, an officer observed what appeared to be a hand-to-hand transfer of drugs to a customer. Affidavit at ¶¶ 172-173. Nevertheless, these surveillance efforts did not allow the officers to identify "the majority of Marin's drug customers or Marin's cocaine source of supply, which [was] a goal" of the investigation. *Id*. at 173.

---

[4] Marin argues that in 2003, related to an earlier federal investigation, a confidential source identified both Marin and Moultrie as cocaine distributors and reported that Marin had recently been released from prison. (Doc. 425 at 17) Marin argues that because Moultrie did not know "Gov,' this should have alerted law enforcement that Marin was not Gov. *Id*. However, the information provided in the affidavit did not suggest that Moultrie and Marin knew each other; it discussed only that the source knew both of these men.

[5] Marin argues that because no money was found on Moultrie and no drugs found in his truck, that this should have caused many other conclusions than the ones the officers formed. First, however, the affidavit does not indicate that Moultrie's person was searched. (Affidavit at ¶ 80). Second, the officers must draw reasonable conclusions. The fact that there are other reasonable conclusions that could have been drawn, does not mean that the officers' conclusions were unreasonable.

1    The affidavit contained reasons why the wiretap was necessary to achieve the goals of the

2    investigation, including to identify the members and structure of the conspiracy, to identify the

3    locations where drugs were stored and cultivated, to identify assets, which could be subject to

4    forfeiture, and to determine how the members how the proceeds of the conspiracy are used.

5    (Affidavit at ¶ 112) The affidavit detailed that the wiretap was necessary also "to obtain direct

6    evidence that will convince a jury beyond a reasonable doubt" of the extent of each member's

7    participation in the conspiracy and drug trafficking activities, where and where the drug

8    trafficking activities occurred, the full information about the proceeds of the crimes and "the

9    nature, scope, places and methods of operation." *Id.* at ¶ 113. It described the traditional

10   investigatory measures taken and why other methods had not been taken. *Id.* at ¶¶ 112-225.

11   **II.      STANDARDS**

12   Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") governs

13   the use of electronic surveillance.  Section 2516(2) of Title 18 governs the validity of state-issued

14   wiretap orders, like those found in this case. Sections 2515 and 2518 of Title 18 address when

15   wiretap evidence must be suppressed and how and when a defendant may move to suppress such

16   wiretap evidence.

17   The authority conferred under Title III for law enforcement agencies to conduct electronic

18   surveillance of suspected criminal activities "is not a blank check."  *United States v. Garcia–*

19   *Villalba*, 585 F.3d 1223, 1227 (9th Cir. 2009). The government must satisfy two requirements

20   before a district court will issue a wiretap order: probable cause[6] and necessity.  *Id.*  As to the

21   probable cause determination, the Court looks "only to the four corners of the wiretap

22   application" and must find a substantial basis for the determination. *United States v. Meling*, 47

23   F.3d 1546, 1552 (9th Cir. 1995) (quoting *United States v. Stanert*, 762 F.2d 775, 779 (9th Cir.),

24   amended, 769 F.2d 1410 (9th Cir. 1985)).

---

[6] Marin does not make a frontal attack on the probable cause determination. To the extent he questions whether the affidavit properly showed that he was known as "Gov" or "Governor," that will be analyzed along with the necessity determination. For the reasons discussed below, the Court finds there was an adequate showing that probable cause existed to demonstrate that Marin sold drugs, given the observed hand-hand sale at his residence and the incomplete sale at Muhammad's apartment and the phone calls leading up to it, during which he agreed with Muhammad to sell drugs to Moultrie.

1    When evaluating whether the wiretap is necessary, the application must include a "full

2    and complete statement" as to whether traditional investigative procedures (1) have been tried and

3    failed; (2) reasonably appear unlikely to succeed if tried; or (3) are too dangerous to try. 18

4    U.S.C. § 2518(l)(c).  The district court may authorize a wiretap order only if it determines on the

5    facts submitted by the government that "normal investigation procedures have been tried and

6    have failed or reasonably appear to be unlikely to succeed or are to be too dangerous."  18 U.S.C.

7    § 2518(3)(c).  "Taken together, §§ 2518(1)(c) and (3)(c) require a showing of necessity before a

8    district court can issue a wiretap order." *United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir.

9    1988)[7]. The purpose of this showing is "to ensure that wiretapping is not resorted to in situations

10   where traditional investigative techniques would suffice to expose the crime." *United States v.*

11   *Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (citations omitted).  However, the issuing court's

12   necessity finding is reviewed for abuse of discretion with particular deference where, as here, the

13   case involves the investigation of a conspiracy.  *United States v. Reed*, 575 F.3d 900, 909 (9th

14   Cir. 2009) (citing *United States v. McGuire*, 307 F.3d 1192, 1197–98 (9th Cir. 2002)).

15   **III.    ANALYSIS**

16   **A.    Necessity**

17   The Ninth Circuit describes the necessity analysis as a two-step approach.  *United States*

18   *v. Rodriguez*, 851 F.3d 931, 937 (9th Cir. 2017).  First, the court reviews de novo whether the

19   application contains a full and complete statement as to whether "other investigative procedures

20   have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be

21   too dangerous." *Id*. at 938.  Second, if the wiretap application meets these requirements, the

22   reviewing court determines whether the issuing court's finding of necessity was an abuse of

23   discretion.  *Id*.

24   **1.    There was a full and complete statement supporting the wiretap**

25   **application.**

26   Marin argues that the affidavit fails to include a "full and complete" statement as to whether

27

28   [7] Marin does not contend that the affidavit contained material misstatements or omissions regarding the
     necessity of the wiretap.

5

traditional investigatory techniques had been tried and failed or whether the untried techniques would be likely to fail or were too dangerous. (Doc. 425 at 32-36) For example, Marin argues that the agents should have conducted more surveillance, interrogated witnesses, obtained search warrants and developed or utilized confidential sources. *Id*. at 33.

Marin asserts that the affidavit fails to adequately detail the conclusion that Marin used TT-10 or was "Gov." (Doc. 425 at 9-18) Marin contends that the conclusion that "Gov" or "Governor" was an alias for Marin lacks foundation because, for example, no one verified that the voice heard on the calls was, indeed, Marin's. (Doc. 425 at 11) However, the context of the conversations between Muhammad and Moultrie and the conversation initiated by Muhammad (as set forth in paragraphs 68 and 69 of the Affidavit), along with the fact that "Gov" agreed to travel to Muhammad's residence and Marin later appeared there after the calls made/received using TT-10, provide a sufficient and reasonable basis for the agent's conclusion. In the later telephone call after Moultrie met with Marin and Muhammad, Muhammad confirmed that the person Moultrie met was "Gov."  (Affidavit at ¶¶ 172-173) Though the affidavit could have included the detail from Wire Intercept Order 1:18-SW-00421 LJO and the Los Angeles state wire intercepts related to the "drug and firearms trafficking involving" Marin and Muhammad, this did not negate the reasonable conclusion made by the affiant that Marin was "Gov."

Marin argues that the agents should have better utilized confidential sources and undercover agents before seeking the wiretap. (Doc. 425 at 20-21) The affidavit demonstrated that in the past, the officers had worked with confidential sources and undercover agents related to the targets of the wiretap. (Affidavit at ¶¶ 132-151) One source was unwilling to conduct a controlled buy with Muhammad due to his "violent criminal history, but also the extreme violence associated with the Muhammad Gang." *Id*. at ¶ 133. Another source, who had provided information in the past about Muhammad, for reasons detailed, was likely to be able to provide information as to Muhammad's sales activities but not about Muhammad's supply chain. *Id.* at ¶ 136. Though a third source had engaged in purchasing cocaine from Muhammad in the past and supplying Muhammad with cocaine, the source was "unwilling to provide direct evidence and is unwilling to testify against MUHAMMAD due to fear of retaliation" by Muhammad. *Id*. at ¶ 138.

The agents also had little luck in obtaining information about Moultrie's participation in the narcotics distribution conspiracy from confidential sources. (Affidavit at ¶¶ 139-144) The affiant determined that there was no information that the confidential sources used in the past could contribute any knowledge about the current conspiracy and because Moultrie, though a target of the investigation, was not one of the primary targets. *Id*. at ¶ 144.

Though the agents knew of sources who interacted with Marin in 2001, these prior interactions 16 years, resulted in Marin's conviction on a federal charge and there was no information that these old sources were still in contact with Marin. (Affidavit at ¶¶ 145-146) Likewise, another source who was in contact with an investigatory target, White, had not provided information beyond White and there was no confidence that the source would be able to get White to introduce him to Marin. *Id*. at ¶ 148. Other than these sources, the agents knew of no other sources who were willing and able to make controlled purchases and, even if they did, such sources could "not satisf[y] all of the goals of the investigation including identifying all members of this illicit organization or their true names and all other criminal organizations conspiring with this organization." *Id*. at ¶¶ 150-151. In addition, "[e]ven if an undercover relationship could be developed, I believe any information gained by an undercover would be minimal in terms of achieving the goals of this investigation . . .This is due to the compartmentalization of a DTO." *Id*. at ¶¶ 153-154.

Marin complains also that the officers failed to engage sufficient surveillance efforts and to use tracking devices before resorting to the wiretap. (Doc. 425 at 21-24) However, the affidavit detailed the physical surveillance efforts related to Muhammad and other coconspirators. (Affidavit at ¶¶ 156-158, 170-173, 177-179) Though these efforts resulted in valuable information (*Id*. at 164-169, 172-173), the targets were sensitive to surveillance and engaged in counter surveillance efforts. *Id*. at ¶¶ 159-163. The affiant explained that the surveillance did not yield sufficient evidence "of the full extent of the criminal activity under investigation" and further surveillance would not do so either, and explained why. *Id*. at ¶¶ 174-176, 180.

The affidavit detailed the various tracking and precise location information warrants obtained related to the investigation. (Affidavit at ¶¶ 182-184, 189-195) The affiant explained that a tracking warrant was not sought for Marin's vehicles because "multiple vehicles have been observed at

MARIN's residence" and the agents could not predict which vehicle Marin would use at any given time in connection with his cocaine distribution activity. *Id*. at ¶¶ 185-186. The affiant explained that the value provided by a vehicle tracker data was limited and that "intercepted communications are necessary to add context to the vehicle tracking information." *Id*. at ¶ 187. Similarly, the affiant explained that the data received from the precise location information warrants was not sufficiently precise to determine the target's actual location. *Id*.at ¶¶ 189-194. In particular, the affiant decided against seeking a precise location information warrant related to Marin because data from Marin's service provider, Sprint, "is not always precise enough to locate the user of a Target" (*Id*. at ¶ 194) but, even if it did, it would have the "same inherent limitations as surveillance and vehicle tracker information" as described in the affidavit. *Id*. at ¶¶ 194-179.

Though Marin takes exception[8] to the fact that no grand jury subpoenas were issued to formally interrogate witnesses, he does not suggest who those witnesses were or what other administrative subpoenas could have been helpful[9]. (Doc. 425 at 24-25) The affidavit detailed that this effort would not be successful for various reasons and would not achieve the goals of the investigation. (Affidavit at ¶¶ 203-208) Ignored by Marin was that various individuals were contacted by agents but refused to make statements. *Id*. at ¶ 207.

Marin complains that, though various warrants were obtained by law enforcement related to the conspiracy (*See* Affidavit ¶ 209), no warrant was sought information specific to him. (Doc. 425 at 25) Among other reasons, the affiant explained this by attesting that such a warrant not "reveal the

---

[8] Marin does not criticize the affidavit related to pen register/trap and trace data collection efforts and notes only that these efforts were made. (Doc. 425 at 24) On the other hand, he complains about the failure to seek a "mail cover." (Doc. 425 at 26) The affidavit explained that a mail cover was not sought because there was no evidence that any target was using the mail to buy or sell narcotics. (Affidavit at ¶¶ 224-225) The affiant explains that because there was no reason to expect any relevant information to be gained from seeking a mail cover, "the risks of pursuing this investigative technique far outweigh the value of the technique." *Id*. at ¶ 225. Marin argues that the affidavit is defective because it failed to detail what risks were associated with seeking the "mail cover." (Doc. 425 at 26) However, despite not explaining the risks, the affidavit adequately demonstrated why this investigatory technique was unlikely to succeed, which is sufficient. *Rodriguez*, 851 F.3d at 938.

[9] Marin admits that the officers obtained records from the California Employment Development Department related to Marin, though to no avail because no wages were reported for Marin during the relevant period. (Doc. 425 at 25, 26) He suggests that this was because he was operating a used car lot at the time. *Id*. at 25. However, the fact that he operated a used car lot would not have meant that there were no EDD records, because there should have been records if he had employees. In any event, this was an investigatory avenue that was tried and failed.

total scope of the operation or the identities of the co-conspirators" nor would it "determine the full scope of the criminal activities, the various methods being used by the members of the organization." Affidavit at ¶¶ 210-212. Moreover, executing a warrant at a location where agents were not certain that evidence would be found, threatened the ongoing viability of the investigation because targets are likely to abandon the location or flee. *Id*.

Finally, Marin also complains that agents should have attempted to search his trash for evidence of crime before seeking the wiretap. (Doc. 425 at 25) He recognizes that agents attempted such an effort at his home (*Id*.), but, though they saw trash cans out at neighbors' homes, there were none outside of Marin's home. (Affidavit at ¶¶ 213-217) At Muhammad's apartment, there was no way to distinguish his trash from the others living at the apartment complex. *Id*. at 213. The affiant explained even still why further trash collection efforts would be of limited value. *Id*. at 213-217.

Though traditional efforts had yielded information and evidence during the investigation before the Court gave authorization for the wiretap, this does not determine that there was no necessity for a wiretap. *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir.2000). "The government need not exhaust every conceivable investigative technique in order to show necessity." *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir. 1990). "[T]he necessity requirement is . . . to be interpreted in a practical and commonsense fashion . . ." *United States v. Bailey*, 607 F.2d 237, 241 (9th Cir.1979). In *United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir.1979), the Ninth Circuit held that 18 U.S.C. § 2518(l)(c), "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope." Given the extensive showing made in the affidavit, the Court finds that the affidavit adequately demonstrated the necessity for the wiretap.

> **2.** **The Court did not abuse its discretion in dining necessity for the wiretap.**

Though it is true that investigators did not exhaust all possible traditional methods as to Marin before seeking to tap his phone, the Court did not err in failing to require the investigators

1    to do so before authorizing the wiretap.  In *United States v. Rivera*, the Ninth Circuit clarified that

2    where "the purpose of the wiretap was to obtain evidence against [an] entire [] organization," the

3    necessity analysis should include all pre-wiretap investigative efforts directed *at the organization*,

4    not only efforts "directed at the users of the [] telephones for which the wiretap was sought." 527

5    F.3d 891 at 903, n.2 (9th Cir. 2008) (emphasis added); *see also Reed*, 515 F.3d at 911 (citing

6    *McGuire*, 307 F.3d at 1197–99) ("[T]he necessity requirement is directed to the objective of the

7    investigation as a whole, and not to any particular person. If the Government can demonstrate that

8    ordinary investigative techniques would not disclose information covering the scope of the []

9    enterprise under investigation, then it has established necessity for the wiretap.")

10            In *Reed*, 575 F.3d at 909-910, the Court discussed the difference between a necessity

11   finding in an investigation of an individual from that of an investigation of a conspiracy. The

12   Court held,

13           "The necessity for the wiretap is evaluated in light of the government's need not
             merely to collect some evidence, but to 'develop an effective case against those
14           involved in the conspiracy.'" *Rivera*, 527 F.3d at 902 (quoting *United States v.
             Decoud*, 456 F.3d 996, 1007 (9th Cir.2006)). "[L]aw enforcement officials need
15           not exhaust every conceivable alternative before obtaining a wiretap." *United
             States v. McGuire*, 307 F.3d 1192, 1196–97 (9th Cir.2002) (citation omitted). The
16           issuing court has considerable discretion in finding necessity, particularly when the
             case involves the investigation of a conspiracy. *Id*. at 1197–98. This court has
17           "consistently upheld findings of necessity where traditional investigative
             techniques lead only to apprehension and prosecution of the main conspirators, but
18           not to apprehension and prosecution of ... other satellite conspirators." *Id*. at 1198
             (quoting *United States v. Torres*, 908 F.2d 1417, 1422 (9th Cir.1990)).
19

20   Likewise, in *United States v. Garcia-Villalba*, 585 F.3d 1223, 1232 (9th Cir. 2009), the Ninth

21   Circuit affirmed the necessity of a wiretap in the context of a drug-trafficking conspiracy where

22   the government's only prior investigation of the target subject was using a pen register and trap-

23   and-trace device on the target phone, as well as making an effort to surveil the subject himself,

24   "not merely unconnected individuals associated with earlier wiretaps."

25   ///

26   ///

27   ///

28   ///

Considering the facts of the affidavit and the nature of the investigation as a whole, the Court finds that the issuing court did not abuse its discretion in concluding that necessity existed to wiretap Marin's phone.  As such, Marin's motion to suppress (Doc. 425) is **DENIED** in its entirety.

IT IS SO ORDERED.

Dated:   __**January 17, 2024**__

UNITED STATES DISTRICT JUDGE

11